**PREMIER RESOURCES, LTD.,**
**Plaintiff-Appellant,**

v.

**NORTHERN NATURAL GAS COMPA-**
**NY, Defendant-Appellee.**

**No. 78–2014.**

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 21, 1980.
Decided March 4, 1980.

Charles L. Birke of Sandler & Rosen, Los Angeles, Cal., for plaintiff-appellant.

Thomas J. Kenan of George, Kenan, Robertson & Lindsey, Oklahoma City, Okl. (Patrick J. McCarthy, Northern Natural Gas Company, Omaha, Neb., and James W. McCall of George, Kenan, Robertson & Lindsey, Oklahoma City, Okl., with him, on brief), for defendant-appellee.

Before DOYLE, BREITENSTEIN and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a natural gas pricing case. Premier Resources, Ltd., the appellant herein, seeks reversal of a judgment rendered by the United States District Court for the Western District of Oklahoma, in favor of the defendant-appellee, Northern Natural Gas Company. Premier is a Colorado corporation engaged in oil and gas exploration and production, and has its principal place of business in Denver. It is what is known in the industry as a small producer of natural gas and is certified by the Federal Power Commission, or the Federal Energy Regulatory Commission, as it is now called. Northern, on the other hand, is a Delaware corporation which has its principal place of business in Omaha, Nebraska, and is essentially an interstate pipeline company.

Premier and Northern had entered into a series of three contracts on February 12, 1973, November 14, 1973, and September 18, 1974. Each of these provided for the sale by Premier to Northern of gas from wells in the Hugoton-Anadarko area, located in Kansas, Oklahoma and Texas. The matter in issue is the amount Premier was entitled to receive for its gas: whether the terms of the contract governed for the period following July 27, 1976, or whether FPC Order No. 742–A, which was adopted on the date just mentioned and which established higher ceiling prices for small-producer sales than had been allowable at the time of execution of the contracts, set the price level. This contract method of pricing was not disapproved by the Supreme Court, but was changed by the Commission afterwards.

The district court ruled in favor of Northern. It found that the pricing provisions of the contracts were "to some extent uncertain and indefinite," and received evidence to clear up the ambiguities. A particular clause which is in all three contracts, the meaning of which is in issue, reads as follows:

> If FPC Order No. 428, as modified, is determined not to be effective with respect to the sale of gas hereunder, then the price charged for gas purchased and sold hereunder shall be such price as is permitted to be effective by the Federal Power Commission and Seller [Premier] agrees to refund amounts paid by Northern in excess of such price.

This provision was included in each of the three mentioned contracts to cover a possible contingency, that of a declaration by the Supreme Court of the United States rendering noneffective Order No. 428, a simplified pricing measure for small producers, which will be discussed presently.

## HISTORY AND BACKGROUND

In 1971, the FPC issued its Order No. 428 (which was later modified by Order Nos. 428–A and 428–B). Number 428 exempted present and future sales of natural gas by FPC-certified "small producers" from direct rate regulation. The purpose of the promulgation of No. 428 was to encourage exploration by small producers and to encourage also their engaging in interstate natural gas production and their competing in the natural gas market. The order exempted small producers from the fixed area rate ceilings imposed by the FPC on large producers.[1] It allowed, with certain limitations, small producers to charge prevailing market prices for their gas.

It was not the object of No. 428 to deregulate the small producers altogether. It sought, however, to limit the regulation by establishing a system of indirect regulation. This consisted of requiring pipeline companies to justify that the prices paid to the small producers were reasonable as a condition to their being able to pass on the differences to their own customers.

Texaco, Inc. challenged this exemption in a suit filed in the United States Court of Appeals for the District of Columbia. That court ruled that No. 428 of the FPC exceeded the authority delegated to the FPC under the Natural Gas Act, 15 U.S.C. §§ 717 et seq. See Texaco, Inc. v. FPC, 154 U.S. App.D.C. 168, 474 F.2d 416 (D.C.Cir.1972). Review was obtained in the Supreme Court, and on June 10, 1974, the Supreme Court gave its ruling. See FPC v. Texaco, Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). It held that Order No. 428 of the FPC was invalid. The Court held that indirect regulation through the mechanism of controlling large producers costs would not merely recreate the situation which the Court in the case of Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), found to be inconsistent with the Natural Gas Act. The Court found that allowing the small producers initially to charge what the market will bear and relying on later regulation of pipeline rates to protect the consumer was contrary to Atlantic Refining Co. v. Public Service Comm'n, 360 U.S. 378, 79 S.Ct. 124, 613 L.Ed.2d 1312 (1959). In effect, the Supreme Court held that Order No. 428 failed to provide a mechanism for insuring that small-producer rates would be just and reasonable, and that a market standard such as was employed in Order No. 428 did not satisfy the Act. The Court said:

> In this posture of the case, we think it clear that Order No. 428 cannot stand in its present form and that the cases should be remanded for further proceedings before the Commission. We have studied the order with care, and we cannot accept the construction of it that the Commission now presses upon us. At the very least, the order is so ambiguous that it falls short of that standard of clarity that administrative orders must exhibit.

417 U.S. at 395–396, 94 S.Ct. at 2325. Essentially, it was the failure to insure the application of the just and reasonable standard that was condemned.

The Court added that " * * * we should also stress that in our view the prevailing price in the marketplace cannot be the final measure of 'just and reasonable' rates mandated by the Act." 417 U.S. at 397, 94 S.Ct. at 2326. The Court stressed that market price and "just and reasonable", although related, are not synonymous. The Court's final conclusion was that the Commission lacked the authority to rely exclusively on market prices in fixing just and reasonable rates. The Court said, however, that it was not condemning indirect

---

1. See generally In re Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (upholding the authority of the FPC to establish a system of area rate regulation for large producers).

regulation of small producers by reviewing pipeline costs of purchased gas so long as the Commission saw to it that the rates paid by pipelines, and ultimately borne by the consumer, were just and reasonable. The Court recognized or conceded that insuring just and reasonable rates by means of indirect regulation might not be feasible.

The *Texaco* decision was announced June 10, 1974. On August 28, 1975, following the remand of the *Texaco* case, the FPC issued its Opinion No. 742.[2] This opinion established a new system of direct regulation of small producers. It set rate ceilings for small producers at 130% of the applicable area rate for comparable sales by large producers.

Following this, the FPC issued its Opinion No. 770, on July 27, 1976, eliminating variable area rate ceilings in favor of new, uniform national rates for large-producer sales of natural gas in interstate commerce. National rates of $1.01 per Mcf for 1973–74 biennium gas and $1.42 for 1975–76 biennium gas were established. The rate of $1.01 per Mcf was modified downward to 93 cents per Mcf in a subsequent FPC Opinion No. 770–A. These two opinions were upheld in *American Public Gas Ass'n v. FPC,* 186 U.S.App.D.C. 23, 567 F.2d 1016 (D.C.Cir. 1977), *cert. denied,* 425 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

On July 28, 1976, the FPC issued its Opinion No. 742–A which reaffirmed that small producers were entitled to higher rates of return than large producers, and that small producers could charge up to 130% of the national rates which were prescribed in Opinion Nos. 770 and 770–A. After that, Premier demanded from Northern increased prices under the three contracts in suit. This demand was pursuant to the FPC Opinion No. 742–A.

We must be mindful that the February 1973 contract and the November 1973 contract came into existence prior to the Supreme Court's decision in *FPC v. Texaco, Inc., supra,* and the September 1974 contract was executed following the Supreme Court's decision in *Texaco* but prior to the FPC proceedings on remand which culminated in issuance of the FPC Opinion No. 742–A which raised substantially the rates allowable to small producers.

Article V, the price provision for each of the contracts, established an initial price of 46 cents per Mcf for gas delivered during the first year of the contract. During the second year, the price was increased to 46.5 cents per Mcf. This Article also contained a so-called redetermination clause which provided a method for increasing contract prices at five-year intervals. It required renegotiation to commence three months before the beginning of the third contract year. The price was redetermined for the succeeding five-year period. The redetermined price provided for was the highest price contained in any contract executed by Northern for the purchase of gas in the county in which the well is located. Similarly, the price was redetermined three months prior to the end of each subsequent five-year period. Article V also provided that the contract price would never be reduced in any price renegotiations.

Pursuant to the redetermination clauses of the contracts, amendments to each contract were executed in 1975 and 1976 which established new, higher rates for natural gas sold for the first five-year terms of each contract. A price range of from 53.0 cents to 79.05 cents per Mcf was established for the February 1973 contract wells, and a price of from 63.6 cents to 80.75 cents was set for the November 1973 contract wells. A price of 60.08 cents per Mcf was established for natural gas delivered under the September 1974 contract.

Three contingency clauses affected prices determined under the redetermination clause. The first was concerned with the possibility of FPC deregulation; the second concerned itself with the possibility that the FPC might not allow a portion of the contract price to be included in Northern's rate

---

**2.** Opinion No. 742 was part of the FPC's Docket No. R 393, the same docket that included Order No. 428.

base. The third proviso is the clause which is the heart of the dispute here. It provides as follows:

> If FPC Order No. 428, as modified, is determined not to be effective with respect to the sale of gas hereunder, then the price charged for gas purchased and sold hereunder shall be such price as is permitted to be effective by the Federal Power Commission and Seller agrees to refund amounts paid by Northern in excess of such price.

There was only a minor difference between the three contracts. The two 1973 contracts were the same. The 1974 contract contains the word "finally" before the word "modified" in the Order No. 428 provision.

Once a price is agreed upon in a contract there are a limited number of ways under FPC regulations for modifying the price. The FPC-approved provisions for a change of price are published in 18 C.F.R. § 154.93 as follows:

> *Provided,* That in contracts executed on or after April 3, 1961, for the sale or transportation of natural gas subject to the jurisdiction of the Commission, any provision for a change of price other than the following provisions shall be inoperative and of no effect at law; the permissible provisions for a change in price are:
> (a) Provisions that change a price in order to reimburse the seller for all or any part of the changes in production, severance, or gathering taxes levied upon the seller;
> (b) Provisions that change a price to a specific amount at a definite date;
> (b–1) Provisions that permit a change in price to the applicable just and reasonable area ceiling rate which has been, or which may be, prescribed by the Commission for the quality of the gas involved; and
> (c) Provisions that, once in five-year contract periods during which there is no provision for a change in price to a specific amount (paragraph (b) of this section), change a price at a definite date by a price-redetermination based upon and not

higher than a producer rate or producer rates which are subject to the jurisdiction of the Commission, are not in issue in suspension or certificate proceedings, and are in the area of the price in question . . . .

It is the meaning of the "Order No. 428" clause in the contract above which is the center of contention here. The issue is whether this clause operates to change the contract price to the applicable "just and reasonable area ceiling rate which has been, or which may be, prescribed by the Commission for the quality of the gas involved" within the meaning of subsection (b–1) of 18 C.F.R. § 154.93. Subsection (b–1), as noted, contains a formula for a change in the contract price. It refers to area rate clauses, and the important character in an area rate clause in a contract is that it calls for automatic escalation of the contract price to coincide with increases in ceiling rates established by the FPC for natural gas sales.

Is the Order No. 428 clause contained in the contract tantamount to an area rate clause within the meaning of subsection (b–1), 18 C.F.R. § 154.93? The two provisions can be compared if they are examined together. So, we set them forth as follows:

> If FPC Order No. 428, as modified, is determined not to be effective with respect to the sale of gas hereunder, then the price charged for gas purchased and sold hereunder shall be such price as is permitted to be effective by the Federal Power Commission and Seller agrees to refund amounts paid by Northern in excess of such price.

> ———

> (b–1) Provisions that permit a change in price to the applicable just and reasonable area ceiling rate which has been, or which may be, prescribed by the Commission for the quality of the gas involved; * * *.

The elements of (b–1) are tied to a just and reasonable area ceiling rate as may be prescribed by the Commission. The Order No. 428 clause says that in the event of the contingency (whereby Order No. 428 is determined not to be effective), then "the

price charged for gas purchased and sold shall be that permitted * * * by the Federal Power Commission." Subsection (b–1) authorizes "Provisions that permit a change in price to the applicable just and reasonable area ceiling rate * * * which may be, prescribed by the Commission * * * ." Do the provisions of the Order No. 428 clause satisfy the requirements of subsection (b–1) which "permit[s] a change in price to the applicable area ceiling rate * * * prescribed by the Commission"?

It is Premier's position that the Order No. 428 clause included in the contracts in question was intended to operate as an area rate clause. Northern denies this emphatically, of course. It contends that the Order No. 428 clause in the contracts had a special purpose. It was intended as a "roll-back" provision only to cover the possibility that the Supreme Court in the *Texaco* case might rule that the higher contract prices contained in the Premier contracts and the contracts of other small producers were illegal. Northern says that if the Supreme Court or the FPC had ordered a retroactive roll-back of prices in small-producer contracts to the rates applicable to large producers, the Order No. 428 clause would have required Premier to refund any excess that Northern paid over the maximum prices permitted. Thus, Northern's interpretation of this clause is that it operates only to lower prices. It has no function where the Commission has increased the price as it has here. The trouble is that it falls short of so providing.

Premier argues that the clause was not a one-edged sword; that it cut both ways, and was also intended by its terms to allow the contract prices to *rise* should the FPC permit increases in small-producer rates as they did here. Premier argues that the language of No. 428 calls for automatic escalation of the contract prices up to the new levels; that it does not make any distinction between increase of prices and decrease of prices.

## THE TRIAL COURT'S RULING

The trial court ruled in favor of Northern. It held that Article V of the contract was devoid of an area rate clause and, of course, that the Order No. 428 clause did not have this effect. The judge ruled that, as a consequence, the prices as redetermined prior to the third year of each of the contracts remained fixed for five years pursuant to the redetermination clause, and that under 18 C.F.R. § 154.93(c) the redetermined prices could not be changed within the five-year period.

The judge in effect ruled that FPC Order No. 428 had been determined not to be effective within the meaning of the Order No. 428 clause.[3] The judge stated that "428 apparently was held [by] the Supreme Court to be no impediment at all to a small producer getting a greater amount than the area rate for a large producer."

In seeking reversal, Premier specifies four issues. First, it contends that the trial court's conclusion was based on the mistaken impression that Premier had stipulated to a certain interpretation of 18 C.F.R. § 154.93. Second, Premier argues that neither Order No. 428 nor 18 C.F.R. § 154.93 precluded the parties from including both a redetermination clause and an area rate clause in the same contract. Third, Premier contends that the language of the Order No. 428 paragraph required the contract prices to rise to the ceiling rates after the Supreme Court's decision in the *Texaco* case. The fourth and final contention is that certain language in the redetermination clause had the effect of incorporating by reference price escalations in contracts in the counties where Premier's wells were located. We need not consider the fourth question in view of our decision.

3. As to the question whether the Order No. 428 clause had been determined not to be effective, we are referring to the following:

> If FPC Order No. 428, as modified, is determined not to be effective with respect to the sale of gas hereunder, then the price charged for gas purchased and sold hereunder shall be such price as is permitted to be effective by the Federal Power Commission and Seller agrees to refund amounts paid by Northern in excess of such price.

## I.

The first of Premier's contentions is that the trial court's finding is based on a mistaken impression that Premier had stipulated to a set interpretation of 18 C.F.R. § 154.93. What the court said was:

This indeed is a two edged sword in this contract. But, what we have got to stop and recognize is—and this is really not disputed here—there are just two formulas or methods of price determination in the industry. One is the area rate clause, and that is not our case because the area rate clause is just not here. I will say why in a moment. The other is the redetermination or renegotiation proviso, which it is undisputed here under the law, can not be redetermined more often than once every five years excepting only after their initial discovery and the first redetermination can be after three years. Now, that is the way that I understand both sides interpret this Section 154.93 of the FPC Regulations, and that is mentioned in Article 5 of the contract.

It cannot be said that Premier made any stipulation of the kind described. Of course, Premier does not dispute the terms of Article V and the five-year clause. However, Premier has not manifested that it agrees that the contract lacks a clause which amounts in substance to an area rate clause. That is what this lawsuit is all about. The contention of Premier is that the FPC Order No. 428 is tantamount to an area rate clause. One of the difficulties with the trial court's decision is that the judge did not consider the similarity between the area rate clause and the Order No. 428 clause which we have noted above. We shall discuss the question as to whether the No. 428 clause satisfied the requirement of an area rate clause in the contract which is set forth among the other escape clauses.

■ The further contention of Premier is that the trial court had misconstrued the testimony of Malcolm Crawford; that Crawford had testified to the effect that during the negotiations he understood that the contract price was for a fixed period of time which was required by the FPC. We fail to see that it has any relevance because, to be sure, the price provided in the contract was for a definite period of time, but 18 C.F.R. § 154.93 contains four grounds whereby the contract prices can be modified. Hence, this does not constitute an injurious admission.

## II.

The next contention of Premier is that neither the FPC Order No. 428 nor 18 C.F.R. § 154.93 prohibited the parties from contracting for prices that would be fixed for a certain period, yet at the same time would be subject to increases to conform to new ceiling rates adopted by the FPC during that period. Premier maintains that the trial judge was in error in assuming that natural gas sales contracts could contain either redetermination clauses or area rate clauses as vehicles for increasing rates, but could not have both.

■ However, this is no issue because Northern acknowledges in its brief that 18 C.F.R. § 154.93 does not prevent inclusion of both subsection (b–1) area rate clauses and subsection (c) redetermination clauses. Examination of 18 C.F.R. § 154.93 readily shows that these permissible price provisions are not mutually exclusive. There is no reason why a natural gas purchase and sale contract cannot include more than one type of FPC-approved price provision. Northern does not deny this, and as we read the trial court's opinion it does not really come to grips with this question, but if it implies that both redetermination clauses and area rate clauses cannot be in the same contract, it would be in error. The judge was asked by counsel for Premier whether the judge was saying that as a result of 18 C.F.R. § 154.93 it would be impermissible for the price to go up. The judge said, "No, I didn't say that at all. I say, if you have an area rate clause in there, of course you can go up. But, absent a rate clause and falling back on this one that was in this contract, the redetermination-renegotiation clause, that under that regulation you can not redetermine oftener than five years. . . ."

Insofar as the trial judge may have given the impression that the five-year duration clause was set in concrete, it was, of course, incorrect. So, the judge's assumption was that the Order No. 428 clause was not tantamount to an area rate clause for this limited purpose. If it is determined that the No. 428 paragraph fills the requirements of an area rate clause, the result is just the opposite from that which the judge reached.[4]

### III.

Premier's next argument, the ultimate and decisive issue in the case, concerns the interpretation of the Order No. 428 clause. Its argument is that it contains the language of an area rate clause, whereby the contract price can rise in the wake of the decision of the Supreme Court in *Texaco* and the adoption by the FPC of Order No. 742–A.

Premier points to the fact that the contract was drafted by Northern, but in view of the fact that we consider the Order No. 428 clause to be unambiguous, this doctrine is of limited value. We do note, however, that Oklahoma law recognizes that:

> In cases of uncertainty *not removed by the preceding rules,* the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. . . .

*Okla.Stat.Ann.* tit. 15 § 170 (West, 1966) (emphasis added). *See also Cities Service Oil Co. v. Geolograph Co.,* 208 Okla. 179, 254 P.2d 775, 782 (1953); *Replogle v. Indian Territory Illuminating Oil Co.,* 193 Okla. 361, 143 P.2d 1002, 1008 (1943). Apparently Northern was allowed to draft the contracts because of its having had more experience doing so.

■ These rules are not, it is true, talismanic. It is said that they are to be applied only after all other rules of contract interpretation have been tried. *See* 3 *Corbin on Contracts* § 559 (1960), at 268. Oklahoma law is to the effect that in the case of

uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

Testimony was offered on behalf of Northern that it is customary in the industry for the purchasers of natural gas to draft the sales contracts. Northern had considerable experience in formulating language that would be acceptable to the FPC. We recognize all of this, but it does not mean that the language of the clause before us should not be read at least in accordance with Oklahoma law.

There are two questions to be considered in interpreting the Order No. 428 clause. The first of these is whether the contingency was met, that is, whether Order No. 428 was determined not to be effective within the meaning of this clause, and, secondly, assuming the contingency was fulfilled, that is, if the Supreme Court held that it is not effective, whether the language of the clause required the contract price to escalate to the higher ceiling rates established by the FPC after the contracts were executed.

### A.

Premier's position is that FPC Order No. 428 was determined not to be effective within the meaning of the No. 428 clause. In the Supreme Court's decision in *Texaco,* it is to be recalled that the Supreme Court did not outlaw contract pricing or indirect pricing. It did, however, hold that Order No. 428 did not provide any clear standards and remanded the cause for further proceedings. Northern, of course, maintains that the Supreme Court held that although it remanded the case, that FPC Order No. 428 was still effective. The trial court stated on this subject that "428 apparently was held [by] the Supreme Court to be no impediment at all to a small producer getting a greater amount than the area rate for a large producer."

---

4. Northern, of course, does not agree with Premier's thesis that the Order No. 428 clause satisfied the area rate clause requirement.

■ There is nothing to be gained from quibbling about whether it was invalidated since the only question for us is that which is contained in Article V of the contract, which says that:

> If FPC Order No. 428, as modified, is determined *not to be effective* with respect to the sale of gas hereunder, then the price charged for gas purchased and sold hereunder shall be such price as is permitted to be effective by the Federal Power Commission and Seller [Premier] agrees to refund amounts paid by Northern in excess of such price. (Emphasis added.)

It cannot be successfully contended that FPC Order No. 428 was determined not to be effective with respect to the sale of gas hereunder or that it was merely a rebate clause. The Supreme Court vacated the No. 428 Order and remanded it ultimately to the Commission for the purpose of adopting clear standards which conformed to the just and reasonable requirement. Following the remand to the Commission, that latter body reestablished a system of direct regulation of small producers and set rate ceilings for small-producer sales of 130% of the applicable area rate for comparable sales by large producers. The Commission then proceeded to change its regulation methods as to rates of large producers.

We must reject Northern's contention that the Supreme Court's holding was something less than a determination that Order No. 428 was not to be effective. Therefore, the No. 428 clause in the contract before us became effective.

B.

■ The next question is whether the further language in the No. 428 clause that the price for gas purchased and sold shall be such price as is permitted to be effective by the Federal Power Commission amounts to the same thing as an area rate clause. As noted above, subsection (b 1) of 18 C.F.R. § 154.93 does define area rate clause in general terms. In other words, it does not prescribe that it must be labeled as an area rate clause. It need only provide for a change in price to the applicable just and reasonable area ceiling rate which has been, or which may be, prescribed by the Commission. Premier maintains that the trial court was in error in failing to examine the language of the No. 428 clause and to compare it to § 154.93(b–1), which permits a change in price to the applicable area ceiling rate. Both the No. 428 clause and subsection (b–1) are, as we have noted above, geared to a rate prescribed by the Commission.

Northern's position in this regard is based on the single proposition that the No. 428 clause was designed to bring about a price adjustment downward in the event that it was determined that small producers could no longer lawfully charge higher contract prices for their gas; that it was a "rollback" provision designed for the protection of Northern stockholders, whereby they would not be required to absorb a loss representing the difference between the contract price and the maximum amount that could be included in Northern's rate base. Northern put into evidence a sample area rate clause contained in a contract between Northern and some other gas producer. Needless to say, it is not written in the same brief terms as the Order No. 428 clause. It contains all kinds of provisions other than the simple definition in 18 C.F.R. § 154.93(b–1). It lists several contingencies. If that particular clause was the definition instead of subsection (b–1), Northern would win the day hands-down. But the official definition is that promulgated by the Commission in 18 C.F.R. § 154.93(b–1).

■ Northern relies on the proviso in the last clause of the No. 428 provision which says that "and Seller agrees to refund amounts paid by Northern in excess of such price." This clause is not applicable because the price of gas was not reduced. Its presence is not inimical to the conclusion that the No. 428 clause was intended to apply to increases as well as decreases in the rates. Had it been intended to apply to decreases only, it would have been simple for Northern to have so written it. Had it done so, Premier would have been alerted to the contention that is now being raised.

Testimony at the trial was offered showing that the contract negotiations were largely devoted to financing arrangements under which Northern would advance payments to Premier to assist in defraying its drilling expenses. The testimony was that Northern would pay the highest possible initial price for Premier's gas. But, William J. Poehling, who testified for Northern, said that it was not Northern's practice to include area rate clauses in sales contracts.

Northern's testimony as to the object of the Order No. 428 clause was that it was intended exclusively to benefit Northern, that is, as a refund provision.

The Premier position was that the clause was to operate two ways, either to offer a refund if a roll-back was ordered, or give Premier the benefits of any higher rates subsequently established by the FPC.

Does the additional covenant given by Premier to refund any amounts in excess of the permitted price supports add anything?

We think not. It would apply only in the event of the contingency of the FPC reducing the rates. We are of the opinion that the clause does satisfy all of the requirements of the subsection (b–1) definition contained in 18 C.F.R. § 154.93.

## CONCLUSION

This case is complicated by the fact that both parties had anticipated that the decision in *Texaco* rendered by the United States Court of Appeals for the District of Columbia Circuit, which decision was that the indirect regulation or pricing method applicable to small producers was contrary to the Natural Gas Act, would likely be affirmed. So, the form of the opinion of the Supreme Court caught them by surprise in that it vacated the existing system and ordered the cause to be remanded to the Commission for the purpose of adopting regulations which were in accordance with the just and reasonable standard of the Act. But, the development which was even more of a surprise to not only the parties involved here but to all concerned was the almost immediate action of the Commission in supplanting area rates with national rates not only for the large producers but for the so-called small producers as well. Opinion No. 742–A provided that the small producer was entitled to a substantially higher rate than that which had been applicable to the large producer.

We are confronted, of course, with whether the contract before us, containing as it does a provision for a price of five years' duration and for renegotiation, continues in effect, or whether the Order No. 428 clause is an "area rate clause" within 18 C.F.R. § 154.93(b–1) so that Premier is entitled to the ceiling rate prescribed by the Commission in the 742–A opinion for small producers. If this is true, the Order No. 428 clause renders the negotiated contract price obsolete.

Our conclusion is that the language in the FPC Order No. 428 clause contained in the contract in suit is plain in its terms and that the language therein that "the price charged for gas purchased and sold hereunder shall be such price as is permitted to be effective by the Federal Power Commission" is plain and unambiguous and does not vary materially from the area rate clause definition in the FPC regulation, 18 C.F.R. § 154.93(b–1).

Under Oklahoma law, the language of the contract governs. *See Okla.Stat. Ann.* tit. 15 § 154 (West, 1966), which provides:

The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.

We reject the contention of Northern that this is a one-way street, which, although it does apply to pricing, the application is limited to lowering the price only— not to raising it. This position is at odds with the applicable language.

Accordingly, it is our conclusion that the judgment of the district court must be reversed and the cause must be remanded with directions to enter judgment for the plaintiff-appellant.