**In re Roman P. WINCHER, Jr. and Nikki J. Wincher, Debtors.**

**HOUSEHOLD RETAIL SERVICES, INC., Plaintiff,**

v.

**Roman P. WINCHER, Jr., Defendant.**

Bankruptcy No. 96–51926–WS.
Adversary No. 96–5041.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

June 12, 1997.

Richardo I. Kilpatrick, Rochester Hills, MI, for plaintiff.

Charles J. Schneider, Detroit, MI, for defendant.

Lawrence Friedman, Southfield, MI, Trustee.

### DECISION AND ORDER RE DISCHARGEABILITY OF DEBT

BURTON PERLMAN, Bankruptcy Judge.

In this Chapter 7 bankruptcy case, plaintiff Household Retail Services, Inc., filed a complaint to determine dischargeability of a debt, which it claims is owed it by debtor/defendant Roman P. Wincher, Jr. The claim is made pursuant to 11 U.S.C. § 523(a)(6). The proceeding came on for trial at the conclusion of which we reserved decision in order that the parties might file memoranda supporting their positions.

We find the following facts. On January 29, 1994, defendant Roman P. Wincher, Jr. did two things. He purchased some furniture from Art Van Furniture, a furniture store at Westland, Michigan. His additional act was to open a credit account at that store, the lender on such credit account being the present plaintiff. As a result of his application, defendant got a credit card to be used only for purchases at Art Van. In connection with the opening of the credit account, defendant signed a Cardholder Agreement. This was a single page document. On the reverse side were two columns of closely written text. One of the paragraphs in that text had a heading: Security. It is because of this provision that plaintiff contends that it held a security interest in furniture purchases which defendant made from Art Van. Defendant, however, never read the material on the reverse side of the application. His attention was not directed to it and he was not informed that a security interest was claimed in items purchased from Art Van. Defendant then was married in October 1994. In connection with that event, additional purchases of furniture were made at Art Van so that defendant and his wife could start up their home. Subsequently, in December 1994, defendant's wife became pregnant and was obliged to quit work. While defendant did make some payments to plaintiff on account of the Art Van furniture, the financial situation of the family deteriorated because of the loss of the wife's income. Defendant and his wife, because of their straitened circumstances, were obliged to move in with relatives. When they moved, defendant had no place to store the furniture which they had purchased at Art Van, and so they sold it. They received some fifteen hundred dollars from the sale of the furniture.

The complaint in this proceeding is based upon § 523(a)(6) of the Bankruptcy Code, which reads:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt for willful and malicious

injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

Plaintiff contends that in these circumstances it is entitled to have its debt held to be nondischargeable because the sale of the furniture upon which plaintiff held a security interest was a conversion. To resolve the present controversy the court must determine whether the circumstances under which defendant sold furniture purchased from Art Van, were "willful and malicious."

Plaintiff in its argument relies primarily upon *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir.1987). In that case, the court held that in order to establish that an act was willful and malicious under § 523(a)(6), the plaintiff must prove that debtor committed an intentional act which necessarily results in injury. Plaintiff contends that the facts before us satisfy the requirements of the definition. That is, defendant sold the property subject to the plaintiff's purchase money security interest, and this sale was a wrongful act without just cause or excuse which necessarily produced harm to plaintiff. Plaintiff depends upon the executed Cardholder Agreement signed by defendant as a basis for asserting that defendant knew or should have known that harm to plaintiff "was substantially certain" to occur. Defendant in his memorandum-in-chief says that the statutory requirement for willfulness is not met in the circumstances of this case. Those circumstances, says defendant, are that the evidence establishes that defendant had no knowledge of the security interest when he sold the furniture. Applying the *Perkins* standard, defendant says that the requirement that the act of which complaint is made be intentional is not met here, for intentional implies that the one charged with improper action did so with knowledge of the rights of the party harmed by the action.

As the parties observe, the Sixth Circuit interpreted § 523(a)(6) in *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir.1987). In that decision, the court quoted from a well known treatise for support of its conclusion.

The treatise has been revised in later editions than the one utilized by the court in *Perkins*, but the language in the current edition departs only slightly from that quoted in *Perkins*. It reads:

> To fall within the exception of § 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will.
>
> The word "willful" means "deliberate or intentional," referring to a deliberate and intentional act that necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm or which has a substantial certainty of causing harm and is without just cause or excuse, may be willful and malicious injury.

4 *Collier on Bankruptcy* ¶ 523.12[1] (15th ed. rev.) [1]

The text then goes on to say:

> Secured creditors whose collateral was disposed of by the debtor often assert nondischargeability claims under § 523(a)(6) on the theory that the security interest was willfully and maliciously converted. Transfers in breach of a security agreement may give rise to nondischargeable liability when the debtor's conduct is knowing and certain or almost certain to cause financial harm. Unless the creditor can prove not only that the debtor knew of the security interest, but also that the debtor knew that a transfer of the property was wrongful, the debt should not be found nondischargeable.

*Id.*

We apply the law as thus stated to the facts of this case. Concededly, defendant sold collateral of plaintiff. That, however, is insufficient to establish a basis for denying discharge on grounds of § 523(a)(6). Here the evidence which we have found as fact establishes that defendant did not know that plain-

---

**1.** The Sixth Circuit in a later case, *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228–9 (6th Cir. 1991) reaffirmed the *Perkins* standard.

tiff held a security interest in the furniture he purchased from Art Van. Plaintiff urges, however, that he should have known, and that should be sufficient for purposes of § 523(a)(6). This Court cannot agree that in the circumstances before us this is valid. The evidence establishes that the security interest arose because of a provision in no way emphasized in a lengthy document presented to an applicant for credit. No one told defendant about the claim of a security interest. So far as defendant was concerned, he was making application for a credit card, and it is common knowledge that credit card transactions do not commonly create security interests. There is no basis upon which a conclusion could be based that defendant knew or should have known of the security interest. We hold, therefore, that defendant's act of selling furniture which he had purchased from Art Van does not constitute a willful and malicious act.

We find the issues in favor of defendant. The complaint is dismissed.

So Ordered.

**In re Donald R. MILLS, Jr., Debtor.**

**H.P. MARKETING CORP., Plaintiff,**

v.

**Donald R. MILLS, Jr., Defendant.**

**Bankruptcy No. 95–3235.**

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

Nov. 8, 1996.

L. Mari Taoka, Toledo, OH, for Plaintiff.

Raymond L. Beebe, Toledo, OH, for Defendant.

## MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after trial upon Plaintiff's Complaint to Determine the Dischargeability of a Debt. This Court has reviewed the written arguments of counsel, evidence presented at trial, as well as the entire record in the case. Based upon that review, and for the following reasons, the Court finds that the debt of Donald R. Mills, Jr. to H.P. Marketing Corp. in the amount of Twelve Thousand Seven Hundred Seventeen and 50/100 Dollars ($12,717.50) is dischargeable.

### FACTS

The Defendant/Debtor in this case, Donald R. Mills, Jr. (hereinafter "Mills"), was a salesperson of photographic equipment for the Plaintiff, H.P. Marketing Corp. (hereinafter "HPM"). In his capacity as a salesperson, Mills received photographic equipment from HPM as samples of the photographic merchandise. Upon the termination of the sales relationship with HPM, Mills disposed of the samples by selling them rather than returning them to HPM. Mills did not use the proceeds of the sale to pay their value to HPM, but rather used the proceeds to pay personal expenses. It is Mills' debt to HPM for the value of these samples which is at issue in this case. The value of the samples is stipulated by the parties to be Twelve Thousand Seven Hundred Seventeen and 50/100 Dollars ($12,717.50). HPM claims that the sale of the samples constitutes embezzlement. Mills claims that he simply exercised his option to retain the goods and be billed for them per the commission agreement between he and HPM, and per the business practice of HPM.

The relationship between HPM and Mills began in 1991, when Mills began to work as a "sub-representative" under a salesman for HPM. As a sub-representative, Mills observed HPM's practice of providing salespersons with various samples of photographic equipment to facilitate the sale of merchandise. Mills also observed that the samples themselves could also be sold to customers. Mills attended sales meetings for representatives and sub-representatives for the purpose of improving sales techniques. At one such sales meeting, in June of 1992, HPM discussed the policies regarding sample items. As a result of this sales meeting a sales bulletin was issued on July 1, 1992, to explain HPM's policy with regard to samples in the possession of salespeople. The bulletin addressed "SOM," which this Court believes to mean "samples of merchandise," and provided in pertinent part:

6.  SOM [Samples of Merchandise]

    There is some confusion on how we want to handle SOM!

    We have two different kinds of memo accounts:

    A—With a time limit

    B—For samples on a permanent basis

    A.  Items with a time limit are usually requested by you for special occasions. They come from our show merchandise samples and have to be scheduled. While we will make almost everything available, we do not have nor will we have 20 of everything as samples.

    B.  Here we are splitting the memo account into items with a net value of $100. and lower and $100. up.

    $100. and lower

    At time of shipment, we will bill you at 30% below our net with 90 days for a due date.

    $100. and Over

    At time of shipment you get a memo invoice.

    After 180 days you will be billed at a net less 30% with 60 days for a due date.

    The 30% off should allow you to sell your sample to a dealer at whatever

attractive price you want to offer it provided, of course, you take good care of your samples.

Do not return the samples because if you can not sell it, then who should?

After all, we only sample you with merchandise where we feel the product is salable and we can move good quantities.

Mills continued in his capacity as sub-representative for approximately two years ending in November of 1992, when Mills entered into a commission agreement with HPM and became a salesperson in his own right. Under the terms of the commission agreement HPM would supply Mills with photographic equipment to be used for customer demonstrations. The agreement, which was drafted by HPM, included the following paragraph:

SAMPLES: A set of samples representative of the line will be made available by HP Marketing for demonstration purposes. Due care must be exercised to maintain samples in good working order and to maintain adequate insurance coverage at all times. Samples may be recalled by HP Marketing Corp. at any time. All samples must be accounted for at the termination of this agreement. Samples not accounted for at the termination of this agreement will be billed and become payable at list price less 50% and be deducted from any commission due.

In November of 1993, Mills notified HPM of his intent to terminate the employment relationship. At that time various photographic equipment remained in Mills' possession. On December 10, 1993, Mills requested a list of samples via facsimile. On December 14, 1993, HPM "faxed" Mills a list of the equipment charged to Mills' account. Mills did not return any samples to HPM. On January 17, 1994, HPM wrote Mills requesting either return of the items or payment. Mills testified that there were numerous items listed that he did not have in his possession. Despite various written, telefacsimile, and telephonic attempts HPM was unable to contact Mills subsequent to his December 10th request.

On May 25, 1994, HPM filed a complaint in the Lucas County Court of Common Pleas seeking a money judgment against Mills. The complaint claimed a debt due "on an account." At trial in this Court, Mills testified that he began to sell the sample photographic equipment in his possession in July of 1994, and received approximately Seven Thousand Dollars ($7,000.00). Mills explained that he did not return the samples to HPM or use the proceeds of the sale to pay HPM because of a personal crisis and related expenses.

On August 30, 1994, HPM obtained a default judgment against Mills in the amount of Seventeen Thousand Six Hundred Fifty-three and 80/100 Dollars ($17,653.80) plus costs and interest. However, as mentioned above, the parties have stipulated for purposes of the present proceeding that the amount in question is Twelve Thousand Seven Hundred Seventeen and 50/100 Dollars ($12,717.50).

Mills filed for relief under Chapter 7 of the Bankruptcy Code on March 31, 1995, and subsequently received a discharge of all dischargeable debts. The pre-petition sales of the photographic equipment were not disclosed in Mills' bankruptcy petition or his personal income tax returns. HPM timely filed the present adversary proceeding, and the trial was held.

### LAW

The Bankruptcy Code provides in pertinent part as follows:

**11 U.S.C. § 523. Exceptions to Discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

**11 U.S.C. § 727. Discharge**

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, muti-

lated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

## DISCUSSION

The sole issue presented in this case is whether the debt at issue is dischargeable. Determinations concerning the dischargeability of particular debts are core proceedings pursuant to 28 U.S.C. § 157. Thus, this case is a core proceeding.

■ HPM charges that the debt at issue in this case arises from an act which constitutes embezzlement, and is therefore nondischargeable per § 523(a)(4) of the Bankruptcy Code. Section 523(a)(4) provides that debts resulting from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," are nondischargeable. It should be noted that a plain reading of § 523(a)(4) reveals there is no fiduciary capacity requirement for debts resulting from embezzlement or larceny. *In re Shane*, 140 B.R. 964, 967 (Bankr.N.D.Ohio 1991); *In re Imbody*, 104 B.R. 830, 840 (Bankr.N.D.Ohio 1989); *In re Shinew*, 33 B.R. 588, 592 (Bankr.N.D.Ohio 1983); 3 *Collier On Bankruptcy* 523.14 at 523–96 (15th ed.1996). In this case, HPM asserts that Mills' actions establish nondischargeability solely under the embezzlement theory.

■ "Embezzlement is the fraudulent appropriation of property by a person to whom such property had been lawfully entrusted or into whose hands it has lawfully come." *Shane*, 140 B.R. at 967, citing *Moore v. United States*, 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895). See also *In re James*, 42 B.R. 265, 266 (Bankr.W.D.Ky.1984); *Black's Law Dictionary* at 522 (6th Ed.1991); 3 *Collier On Bankruptcy* 523.14[3] at 523–97 (15th ed.1996). Therefore, HPM must prove that (1) Mills lawfully acquired the property with the consent of HPM; (2) Mills appropri-

ated the property for his own use; and (3) some form of fraud or deceit was used. *Shane*, 140 B.R. at 967. The United States Supreme Court has held that the preponderance of the evidence standard of proof should be applied to all dischargeability exceptions under § 523(a) of the Bankruptcy Code. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Exceptions to dischargeability are to be strictly construed in favor of the debtor. *In re Ward*, 857 F.2d 1082, 1083 (6th Cir.1988) citing *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915) and *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986).

■ Two of the three elements for embezzlement are clearly shown in the present case. First, the property was acquired by lawful means. The facts indicate that Mills received the samples from HPM for the purpose of facilitating sales. Second, he appropriated the property for his own use, having sold them and retained the proceeds. The use of fraud or deceit is the final element of embezzlement that must be proven by HPM. The issue before this Court is whether Mills acted fraudulently when he disposed of the samples, or whether he reasonably assumed he could undertake personal liability for the payment of the value of the samples.

The commission agreement between Mills and HPM states that all samples must be kept in good condition, that HPM may recall samples at any time, and that all samples must be accounted for at the termination of this agreement. This would tend to indicate that HPM retained ownership of the samples entrusted to their salespeople. However, the agreement also provides that, "Samples not accounted for at the termination of this agreement will be billed and become payable at list price less 50% and be deducted from any commission due." Thus, the contract provides for the remedy for a salesperson's failure to account for the samples. That is, the salesperson will become personally liable for the samples not returned. Thus, this provision would appear to operate to allow a salesperson to either return the samples, or to retain and be liable for them. This conclusion is bolstered by the fact that HPM drafted this agreement, considering the long es-

tablished principle in contract law that the drafter of a contract bears the burden for any ambiguity. *In re Harstad,* 155 B.R. 500, 510–511 (Bankr.D.Minn.1993) citing *Adelman v. Minnwest Bank of Ortonville, Ortonville, Minn.,* 97 B.R. 569, 572 (Bankr.D.S.D.1988), *Local Union 238 v. C.R.S.T., Inc.,* 795 F.2d 1400, 1406 (8th Cir.) *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986), *Premier Resources Ltd. v. Northern Natural Gas Co.,* 616 F.2d 1171, 1178 (10th Cir.1980), *Restatement (Second) of* Contracts § 206 (1979), and *In re Stratford of Texas Inc.,* 635 F.2d 365, 368 (5th Cir.1981).

The sales bulletin dated July 1, 1992, also supports the conclusion that salespersons may elect to retain the items and be billed for them. In fact, the bulletin appears to encourage it. It provides that salespersons will be billed at a discount to assist them in selling the samples, and specifically states, "Do not return the samples because if you can not sell it, then who should? After all, we only sample you with merchandise where we feel the product is salable and we can move good quantities." The bulletin also appears to show that while salespersons were attempting to sell the samples, HPM would automatically bill the salespersons. Further, Mills testified that during his employment with HPM he was often billed for samples that had been shipped to him. He further testified that previous amounts owed to HPM for samples received were automatically deducted from his commission payments.

It is also noteworthy that when HPM filed suit against Mills on May 25, 1994, it did so "on an account" and not for the conversion of property. A copy of the "account" was attached to the state court complaint, and listed the items allegedly retained by Mills, along with the prices for which he was billed.

Based on these facts, it appears to this Court that it was HPM's practice to automatically sell the samples to the salespersons by billing them and deducting the amount from commissions due, and yet still claim the rights of ownership if payment could not be compelled. The result is ambiguity as to when the ownership of the samples actually transfers, and whether an option to buy is conferred in the practice or contract. It is obvious that HPM wanted to assume that salespersons would purchase the samples, and would routinely bill them prior to any affirmative election made by the salespersons. Thus, it appears to this Court that the salesperson is, at a minimum, given the opportunity to elect to retain the items and become liable for the debt. Further, regardless of the determination of the specific property and contract rights of the parties, this Court cannot find that Mills had the intent necessary for embezzlement. Mills could routinely elect to purchase the items and resell them, and later be billed for the debt. Thus, the resulting debt, which in this case went unpaid, is simply an ordinary debt.

The Bankruptcy Court in *In re Epperson,* 45 B.R. 708 (Bankr.E.D.Tenn.1985), had before it a case similar to the case at hand. In *Epperson,* the creditor provided the debtor with guns for sale on consignment. The debtor was given "unfettered power of disposition ... so long as the agreed-upon price was returned to Plaintiff following that disposition." *Id.* at 710. Faced with financial difficulties and unable to pay the creditor for firearms he had sold, the debtor filed a petition for bankruptcy. Since the Debtor had unlimited discretion regarding how and for what price he would sell the firearms, the sale of them created nothing more than an ordinary debt and did not result from an act of embezzlement. *Id.* at 711. Although this Court realizes that the standard of proof applied by the *Epperson* court was that of clear and convincing evidence, and that the standard of proof in dischargeability determinations has been lowered to the preponderance of the evidence standard by the Supreme Court in *Grogan v. Garner,* this Court nevertheless finds that a similar outcome is warranted in the case at bar.

Plaintiff makes a number of arguments attempting to show the Mills' fraudulent intent. Plaintiff points to Mills' December 10, 1993, facsimile, which requested a list of items allegedly in his possession. Plaintiff asserts that this request indicates acknowledgment that he was obligated to return the samples rather than become liable for the cash value. However, simply asking HPM about the samples does not evidence fraudu-

lent intent as required to show embezzlement. Nor does it change what this Court believes to be the nature of the commission agreement and business practice of HPM, which allowed Mills to retain the samples and incur the debt.

HPM also points to the fact that the value that the items were sold for was only about Seven Thousand Dollars ($7,000.00), which is far less than the stipulated value of Twelve Thousand Seven Hundred Seventeen and 50/100 Dollars ($12,717.50). Though this certainly does not lend support to the propriety of Mills actions, this Court does not feel that it changes the result in this case. First, the items were not all sold at once, so it is not clear whether Mills expected the shortfall. Second, there was disagreement between Mills and HPM as to which items he had in his possession at the time the relationship was terminated. HPM assumed Mills had more samples than Mills says he had. As it appears to be a routine encouraged by HPM for salespersons to sell samples, such a discrepancy seems plausible, and can at least partially explain the difference in the value received upon their sale. Finally, the propriety of the election to retain the items and incur the debt does not change the nature of the agreement and business practice which allowed Mills to do so.

HPM also argues that fraudulent intent can also be evidenced by the fact that the sale of the photographic equipment and the disposition of the proceeds was not listed on Debtor's 1994 Federal Income Tax forms, or on his bankruptcy schedules. While a failure to conform with the Bankruptcy Code can, in appropriate circumstances, be grounds for the denial of a discharge under § 727(a)(4), that is not what is at issue in this case. What is at issue in this case is whether Debtor possessed the requisite intent to defraud in conjunction with the alleged act of embezzlement. Perhaps HPM is trying to assert that the Debtor was trying to cover up what he knew to be embezzlement, and so his self-perceived guilt is evidence of a fraudulent intent at the time of the alleged act of embezzlement. If so, this Court finds such an indirect inference lacking substance in this case, and it is further weakened by the fact that HPM was properly listed as a creditor and received the appropriate notice of the bankruptcy.

This Court concludes that HPM failed to prove that Mills acted with the requisite fraudulent intent necessary to show embezzlement by the sale of the photographic equipment. In reaching the conclusions found herein, the Court has considered all the evidence and arguments of counsel, regardless of whether they are specifically mentioned in this opinion.

Accordingly, it is

**ORDERED** that the debt owed to Plaintiff totals Twelve Thousand Seven Hundred Seventeen and 50/100 Dollars ($12,717.50), and that this debt be, and is hereby, determined *DISCHARGEABLE*.

**In re Milton J. GUTH, Debtor.**

**Donald D. WEISBERGER, Plaintiff,**

**v.**

**Milton J. GUTH, Defendant.**

**Bankruptcy No. 96–14197.**
**Adversary No. 96–1364.**

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

May 2, 1997.

Donald D. Weisberger, Cleveland Hts., OH, for Plaintiff.

Milton J. Guth, Lyndhurst, OH, Pro Se.

### *MEMORANDUM OF OPINION AND ORDER*

RANDOLPH BAXTER, Bankruptcy Judge.

Donald D. Weisberger (Plaintiff) seeks a ruling in this proceeding which, if granted, would deny discharge of a scheduled judgment debt. During the course of a trial, Debtor Defendant Milton J. Guth (the Debtor) moved for a directed verdict following the close of the Plaintiff's case-in-chief. The Debtor further stated that he would present no case-in-chief following the Court's ruling on his motion for directed verdict.

The dispositive facts are generally not in dispute. Both Plaintiff and the Debtor are licensed attorneys practicing in the State of Ohio. Prepetition, Plaintiff agreed to serve as co-counsel with the Debtor in a state court medical malpractice action. In doing so, the parties agreed to divide equally any award of attorneys fees. (See, Ex. B). Said state court action ended in a $150,000.00 judgment favorable to their client. From the judgment amount, forty percent (40%) or $60,000.00

represented the attorney fees to be divided between Plaintiff and the Debtor. When the Debtor failed to pay the amount of fees owed to Plaintiff, the latter commenced a state court civil action against the Debtor which resulted in a consent judgment favorable to the Plaintiff in the amount of $30,750.00 issued on October 15, 1987. Subsequently, the Debtor sought voluntary relief under Chapter 7 of the Bankruptcy Code, and this proceeding ensued.

■ In resolving this action, the Court must determine whether the Debtor's failure to pay certain attorneys fees to Plaintiff constituted an act of fraud while acting in a fiduciary capacity thereby rendering the debt nondischargeable. The burden of proof is upon the complainant who must prove his case by a preponderance of evidence. *In re Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Plaintiff alleges, *inter alia*, that the Debtor committed an act of constructive fraud while serving in his capacity as trustee of certain wrongful death settlement proceeds. More specifically, the Plaintiff alleges that the Debtor's failure to pay him his share of the attorney's fees from the settlement proceeds constituted the constructive fraudulent act. (See, Complaint ¶ 4).

Under § 523(a)(4) of the Bankruptcy Code [11 U.S.C., 523(a)(4) ], the following is noted in pertinent part:

§ 523(a):

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt

—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. 11 U.S.C. § 523(a)(4).

As stated, Plaintiff contends that the Debtor committed constructive fraud by not paying him his agreed upon share of the attorneys fees. In his case-in-chief, Plaintiff called but one witness—the Debtor, as if on cross-examination. Therein, the Debtor conceded that he retained Plaintiff to assist him as co-counsel in a state court civil action and agreed to split the legal fees equally. He further testified that Plaintiff was awarded a

judgment against him in a separate state court civil action in an amount of $30,750.00 as a result of his failure to pay the agreed upon fees. (Guth, Cross–Examination). He also acknowledged that he breached a contractual relationship he entered into with Plaintiff in this regard. He does not agree that he committed any fraudulent act towards Plaintiff and further asserted that there was never any fiduciary relationship between himself and Plaintiff.

*Exhibits*

From the $150,000.00 civil judgment in which the parties herein were to split attorneys fees, the settlement distribution sheet (Jt.Ex. 1, p. 2) shows a total of $75,000.00 allocated to attorneys fees. In response to Court inquiry, the Debtor stated that the $75,000.00 includes the subject attorneys fees, in addition to certain legal fees owed to one Attorney Richard White who also provided legal assistance in the case.

■ From the evidence admitted, an examination of the record, generally, no fiduciary relationship has been proved by the Plaintiff. In order to succeed in a nondischargeability action under § 523(a)(4) based upon fraudulent conduct, it is incumbent upon the complaining party to show the existence of a fiduciary relationship with the defending party at the time of the alleged misconduct. Herein, Plaintiff, although alleging a fiduciary relationship, presented no evidence to support the allegation. Even his pretrial statement (p.1, ¶ 2) acknowledges, in part, that his relationship with the debtor was contractual in nature. Further, the judicial authority he relies upon, *In re Harris–Miles*, 187 B.R. 178 (Bankr.N.D.Ohio 1995) is not supportive of the Plaintiff's position where he has not met the threshold requirement under § 523(a)(4) of proving the existence of a fiduciary relationship. Plaintiff, in fact, tendered four (4) exhibits for admission into evidence. Neither exhibit was opposed and neither exhibit established proof of a fiduciary relationship with the Debtor. *Harris–Miles* required the plaintiff therein to show establishment of a trust while acting in a fiduciary capacity and a breach of that relationship before nondischargeability can

be found under § 523(a)(4). Herein, if a fiduciary relationship existed between the parties, Plaintiff failed to prove it by the requisite burden of proof. Only an express or technical trust will give rise to a fiduciary relationship. *In re Garver*, 180 B.R. 181 (Bankr.N.D.Ohio 1995). Neither has been adduced by the Plaintiff in the case at bar. It is well-established in this Circuit that to successfully maintain a nondischargeability of debt incurred by a debtor while acting in a fiduciary capacity it is necessary to: (1) show the existence of an express trust status to the property in issue; (2) the debtor was acting in a fiduciary capacity; and (3) the debtor breached that relationship by at least defalcation of funds. *In re Interstate Agency, Inc.*, 760 F.2d 121 (6th Cir.1985), *citing, Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). With no fiduciary relationship being established, the Plaintiff has failed to meet his burden.

Notwithstanding the handwritten language in paragraph 3 of Jt. Ex. B which indicates, in part that, "the parties agree that the agreement to divide fees which was the basis for the within lawsuit established a trust agreement between the attorney respecting the fees collected in which both were entitled to share," such language fails to establish an express or technical trust which would give rise to a fiduciary relationship. As one commentator correctly noted:

> A trust will only be considered if it is an "express" or "technical" trust arising out of the relationship and not a "statutory" or "constructive" trust created by the act out of which the debt arose in the first place. In other words, if there is a general trust established by state law between partners in a partnership or between an officer or director and her corporation, then a fiduciary relationship exists. However, if the trust arose only by statute when the fraud or defalcation was committed, then the trust is insufficient to establish the requisite fiduciary relationship.[FN1]

------

FN1. Bankruptcy, Epstein, et al., § 7–28, p. 518 (1993).